# GOLDBERG & RIMBERG PLLC

*Attorneys at Law*

115 BROADWAY – 3RD FLOOR
NEW YORK, NEW YORK 10006
Tel: (212) 697-3250 x349
Fax: (866) 651-3196

September 9, 2008

**REQUSTED TO BE FILED UNDER SEAL**[1]

**VIA HAND DELIVERY**

Honorable Colleen McMahon
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:  <u>United States v. Travis Smalls</u>
            07 Cr. 582(04)(CM)

Dear Judge McMahon:

      This letter is respectfully submitted in connection with the upcoming sentencing of defendant Travis Smalls, which is currently scheduled to take place before Your Honor on September 26, 2008, at 2:00 P.M.

    I.   <u>Introduction</u>

      On March 19, 2008, defendant Travis Smalls pleaded guilty to Count 1 of the indictment in this case. Count 1 charges that between October 2005 and February 2006, Travis conspired with Esmond Elcock, Jr., Pierre Richard Renee, Nadine Whittingham and James Malloy to commit a bank fraud in violation of 18 USC § 1344.

---



Hon. Colleen McMahon
September 9, 2008
Page 2


        When Travis pleaded guilty on March 19, 2008, he
did so without a plea agreement, but after consideration of
a sentencing guidelines estimate that was provided by the
Government pursuant to United States v. Pimentel, 932 F.2d
1029, 1034 (2d Cir. 1991) (the "Pimentel letter"). A copy
of the Pimentel letter is annexed hereto as Exhibit A.

        I.    Federal Sentencing after the Supreme Court
              Decisions in Booker and Fanfan.


        As Your Honor is aware, in January 2005, the
Supreme Court issued a decision regarding the
constitutionality of the United States Sentencing
Guidelines ("U.S.S.G." or the "guidelines") which
dramatically modified the landscape for federal sentencing
in this country. See United States v. Booker and United
States v. Fanfan, 543 U.S. 220, 125 S. Ct. 738 (Jan. 12,
2005) ("Booker"). The Booker decision was the culmination
of various decisions that addressed a defendant's sixth
amendment rights in the context of sentencing. See
Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348,
2362-63 (2000); Ring v. Arizona, 536 U.S. 584, 122 S. Ct.
2428 (2002), and Blakely v. Washington, 542 U.S. 296, 124
S. Ct. 2531 (2004). In Booker, supra, the Supreme Court
applied its prior decisions in Apprendi and Blakely, supra,
to the guidelines and held that it was improper to allow
judges to impose sentencing enhancements, where the facts
related to those enhancements had not been admitted by the
defendant, or charged and proven to a jury beyond a
reasonable doubt. Booker, supra, 543 U.S. at 244, 125 S.
Ct. at 756. Thus, the Supreme Court determined that the
guidelines impinged on a defendant's constitutional right
to a jury trial. Id.

        The Booker decision also announced a remedy for
the constitutionally defective guidelines. The Court
explained that its holding was incompatible with the
provision of 18 U.S.C. § 3553(b)(1) which makes application
of the guidelines mandatory. Id. The Court then held that
in order for the guidelines to pass constitutional muster,
the language of 18 U.S.C. § 3553(b)(1) must be adjusted so
that the application of the guidelines is no longer
mandatory, but advisory. Booker, supra, 543 U.S. at 248-

Hon. Colleen McMahon
September 9, 2008
Page 3

266, 125 S. Ct. at 758-768. See also Gall v. United
States, ___ U.S. ___, 128 S. Ct. 586 (2007); Kimbrough v.
United States, ___ U.S. ___, 128 S. Ct. 558 (2007).

      The Court explained further that in determining
what sentence to impose, judges must consider all of the
factors outlined in 18 U.S.C. § 3553(a), and that the
guidelines are merely one factor to be considered, together
with all the other relevant sentencing factors outlined in
18 U.S.C. § 3553(a). Booker, supra, 543 U.S. at 260-261,
125 S. Ct. at 764-765.

      Thus, it is respectfully submitted that after
Booker, supra, district courts may now even consider those
factors whose consideration was previously precluded by the
Guidelines. See e.g., Kimbrough v. United States, ___U.S.
__, 128 S. Ct. 558 (2007) (permitting consideration of
sentencing disparity between crack cocaine guidelines and
guidelines for cocaine in powder form).

## II.  The Sentencing Factors.

      As illustrated above, the Booker decision
mandates that a court imposing sentence consider not only
the applicable advisory guidelines, but all of the factors
outlined in 18 U.S.C. § 3553(a), including but not limited
to:

    1.  the nature and circumstances of the
offense and the history and
characteristics of the defendant;

    2.  the need for the sentence imposed

      (A)  to reflect the seriousness of the
offense, to promote respect for
the law, and to provide just
punishment for the offense;

      (B)  to afford adequate deterrence to
criminal conduct;

      (C)  to protect the public from further
crimes of the defendant;  and

Hon. Colleen McMahon
September 9, 2008
Page 4

      (D)   to provide the defendant with
            needed educational or vocational
            training, medical care, or other
            correctional treatment in the most
            effective manner;

   3.   the kinds of sentences available;. . .

   6.   the need to avoid unwarranted sentence
       disparities . . .

   7.   the need to provide restitution to any
       victims of the offense.

Title 18 U.S.C. § 3553(a).

     Moreover, courts must impose "a sentence sufficient, but not greater than necessary" to meet the objectives of sentencing.  See 18 U.S.C. § 3553(a).

    A.   Travis's Personal Background and
        the Nature and Circumstances of the Offense.

     As set forth in the detailed pre-sentence report ("PSR") prepared by the Probation Department in this case, Travis Hilton Smalls ("Travis") is currently 24 years-old. His parents are Ronald Smalls, age 53, and Renee Sharp, age 51.  Travis has no siblings.  Travis's mother, Renee, currently lives in Pennsylvania with her boyfriend.  She travels to New York City regularly, where she works at a homeless shelter.  Travis's father, Ronald, is currently incarcerated on Riker's Island in connection with a narcotics offense.  Travis currently resides with his grandmother, Ruth Sharp, at 1070 Elder Avenue, apartment 4A, Bronx, NY.  Ruth Sharp is a retired New York City Teacher's Aid.  She currently works at a Day Care Center in the Bronx.

     Travis reports that he grew up at 358 West 127th Street, New York, NY, in a high crime and drug infested neighborhood in New York City.  He lived together with both of his parents at that address until 2003, when his parents separated.  He attended elementary school in New York City and reports that he led a relatively normal and

Hon. Colleen McMahon
September 9, 2008
Page 5

unremarkable life until 1997, when he turned approximately 14 years old.

In 1997, Travis's father began selling heroin. In that regard, Travis reports that in or around 1997, strange people began to appear at the family home. Although, his father had made superficial attempts to hide the drug dealing from Travis and his mother, Travis reports that he could not help but notice because random people began ringing the doorbell at all hours of the day and night. When Travis's mother would confront his father about this behavior, he appeared to stop selling for a while.

In 1999, however, Travis's cousin CJ (who was only 27 years old), was caught in the cross-fire of a shootout between rival drug dealers in front of Travis's apartment. There, Travis watched CJ die on the street in front of his home and he was devastated.

At around the same time as CJ's death, Travis's father began selling drugs out of the apartment again. Notwithstanding his father's drug selling activity, Travis wanted, and was able, to distance himself from that lifestyle, and from 1998 through 2002, he continued in school and pursued a high school diploma. Having seen CJ die as a result of a drug war, and knowing that his father was supporting the family with drug money, he vowed to himself that he would never use drugs or alcohol, a vow that he has kept through this very day. Instead, Travis focused on obtaining an education, and on June 26, 2002, Travis graduated from Manhattan Village High School with an overall "good" rating. PSR at ¶ 61.

In or around April 2002, Travis's father's drug dealing increased. As a result, in or around April 2002, when Travis was in school, a SWAT team from the New York City Police Department raided the family's home and arrested his father. Travis reports that his father was released a short time later due to insufficient evidence.

Approximately one month later, the family home was again raided by the New York City Police Department. As a result of this raid, Travis's father was arrested

Hon. Colleen McMahon
September 9, 2008
Page 6

again.  This time, however, there was sufficient evidence
and his father was convicted for a drug sale and was
sentenced to a State prison term.  Travis reports that he
was home at the time of this second raid.  When asked by
the Probation Officer whether he was traumatized by the
raid and his father's arrest, Travis replied "no" because
seeing people get arrested for drug sales and other illegal
activity was a regular occurrence in his neighborhood.  PSR
at ¶ 49.  On the other hand, having witnessed the arrest of
his father, Travis became determined not to make the same
mistakes and he continued to pursue an education.  In that
regard, from 2002 through 2003, Travis attended John Jay
College of Criminal Justice.

    In 2003, however, after his father was sentenced,
Travis's mother decided to leave New York, and she
relocated to Pennsylvania to start a new life.  Travis,
however, did not follow her to Pennsylvania.  Instead, he
moved in with his Aunt, Marylin Opperman, who resided in
the William H. Taft Housing Projects, so that he could
assist and be close to his grandmother, Ruth Sharp, who was
then suffering from breast cancer.

    Soon after his mother left New York, Travis's
financial situation took a turn for the worse and he was no
longer able to continue to attend college.  He was,
however, able to secure employment at Harlem Hospital as a
Mortuary Technician, where he assisted with autopsies and
preparing bodies for burial, a field of study he hopes to
pursue if he is ever in a position to return to school.
Thereafter, Travis spent most of his free time and money on
his grandmother because she was recovering from breast
cancer and needed his help.

    Living in the Taft Housing Projects was not easy.
Travis was surrounded by various corrupt elements, but
tried to stay out of trouble by attending to his
responsibilities at work and by tending to his grandmother.
Unfortunately, living in a crime infested neighborhood
finally caught up with Travis in 2005, when, while on his
way home from a baseball game, he was robbed and shot in
the leg on the grounds of the Projects.  Travis did not
tell his family about the robbery and the shooting for a
lengthy period of time because he was concerned of the
impact it would have on his grandmother.

Hon. Colleen McMahon
September 9, 2008
Page 7


     It was sometime after the above-referenced
incident that Travis's employment at Harlem Hospital was
reduced to part-time status.  At around the same time,



     In or around June 2006, while walking home from
work, Travis saw some of the group that had robbed and shot
him previously.  At that time, Travis became extremely
nervous about being attacked again and he asked his
grandmother if they could move out of the neighborhood.
His grandmother initiated the process of moving out of the
area, but Travis kept thinking about his cousin CJ, and was
simply afraid of being attacked again or killed.  With
those thoughts in his head, Travis again committed a grave
error in judgment.  He thought that if he had a weapon, he

Hon. Colleen McMahon
September 9, 2008
Page 8


would be able to protect himself if attacked again.
Accordingly, on July 29, 2006, Travis purchased a firearm.
Fortunately, or unfortunately, Travis was arrested for
possession of that weapon only moments later.  After being
arrested, Travis was released on his own recognizance.  As
indicated in the accompanying letter of Kate Mogulescu,
Esq., Travis's attorney on his New York State weapon's
charge (annexed hereto as Exhibit B), Travis recognized his
error in judgment and accepted full responsibility for his
actions by pleading guilty to the weapons possession charge
before Judge Charles Solomon.  In that regard, Ms.
Mogulescu writes:

> Judge Solomon also recognized that Travis
> made a very immature mistake and gave him
> an opportunity to avoid jail time.

Exhibit B.  Indeed, Ms. Mogulescu explains that Travis
has been on strict conditions of pre-trial release,
which require, among other things, that Travis attend
court at least once per month.  Further, so long as
Travis does not get into any further trouble, Judge
Solomon ultimately intends to impose a non-jail
sentence.  After his arrest in New York County, Travis
and his Grandmother moved to their current address on
Elder Avenue in the Bronx.



Hon. Colleen McMahon
September 9, 2008
Page 9


detained.  Travis spent the next four months in the
Ulster County Jail awaiting trial.

     While in custody in Ulster County, Travis had
time to think and reflect upon the things that had led
him to being arrested in New Paltz.  He knew that he had
made some terrible mistakes 

     Once Travis walked out of the Ulster County
Jail, after serving those long four months, he thought
that his involvement █████████ had ended and that he
had paid for his past mistakes.  He became even more
resolved to put his life back in order and to once again
become a law-abiding member of society.  To that end, he
returned to Harlem Hospital, where he was able to secure
a volunteer position as a Mortuary Technician.  The
position was voluntary, because Harlem Hospital was not
able to offer him a paying job at that time.  His former
supervisor, Mr. Norris Cook, needed help and offered to
pay Travis out of his own pocket and "off the books" so
that Travis would continue to work.  Mr. Cook also
reassured Travis that he would help him secure a full-
time position, if one ever became available.  See Letter
of Norris Cook, annexed hereto as Exhibit C.
Unfortunately, on July 25, 2008, a full-time paid
position became available, but it was filled by a prior
full-time employee at the hospital.  Id.

     After being charged in this case, and
recognizing that his jail time in Ulster County did not
cover the instant offense, Travis did not hesitate to
accept his responsibility.  ████████████████

Hon. Colleen McMahon
September 9, 2008
Page 10



  In the 12 months that have passed since his
arrest in this case, Travis has matured even further.
He is now involved in a productive relationship with
Gaby Navarrete, with whom he is engaged to be married.
He has also become a father figure to her young son and
he picks him up from school every day.  Travis and Gaby
are attempting to build a solid relationship.  Gaby is
mindful of Travis's mistakes and his lapses in judgment,
but believes that Travis is a good man and that he will
be a great father to her son.  <u>See</u> Letter of Gaby
Navarrete, annexed hereto as Exhibit D.

  B. The Sentencing Guidelines
    <u>and Defendant's Objections to the PSR</u>


  The Probation Department calculated the
sentencing guidelines in this case as follows:

  1. A base offense level of 7
    pursuant to U.S.S.G. § 2B1.1 (a)(1);   7
    (PSR at ¶ 28);

  2. A 4 level increase because the loss
    foreseeable to defendant was a loss of more
    than $10,000 but less than $30,000   <u>+4</u>
    (PSR at ¶ 29);

    **(Subtotal**        **11**)

  3. A two-level downward reduction
    pursuant to U.S.S.G. § 3E1.1(a) because
    defendant has demonstrated his

Hon. Colleen McMahon
September 9, 2008
Page 11

                    acceptance of responsibility
                    (see PSR at ¶ 34).                              -2

         **Total Adjusted Offense Level**                           **9**

         Based upon the above, the Probation Department
concluded that Travis's total offense level should be fixed
at Level 9.  See PSR at ¶ 37.

                    i.   The PSR's Criminal
                         History Calculations.

         With respect to Travis's Criminal History, the
Probation Department has assigned Travis to Criminal
History Category II, based upon:

         1.    Travis's June 14, 2007 conviction for
               Criminal Possession of a Weapon in the Third
               degree (PSR at ¶ 40); and

         2.    his July 26, 2007 conviction for Petit
               Larceny in Ulster County (PSR at ¶¶ 42-44).

         Based upon a guidelines offense level of level 9
and a Criminal History Category of II, the guidelines
sentencing range would be in zone B of the guidelines
Sentencing Table and would yield a guidelines sentencing
range of 6-12 months.

                    ii.  The Defense Position With Respect to
                         the Criminal History Calculations.

         It is respectfully submitted that Travis should
only be assessed one Criminal History point in this case.


         Paragraph 44 of the PSR states that:

         . . . defense counsel believes that the arrest is
         related to the instant offense and therefore
         Smalls should not be assessed any criminal
         history points. Our response is that although
         this case is also a check fraud scheme, it
         occurred after the dates in the indictment and it
         otherwise does not appear to be related . . .

Hon. Colleen McMahon
September 9, 2008
Page 12



Once he was arrested in this case, however,
Travis accepted his responsibility freely and provided a
detailed explanation of both check cashing methods to the
Government.

the defense submits that the Ulster County conviction
should not be used to enhance Travis's criminal history
See U.S.S.G.
§4A1.2(a)(1); see also Application Note to U.S.S.G.
§ 4A1.2.

If the Ulster County conviction is not counted,
the guidelines sentencing range would be in zone B of the
guidelines Sentencing Table and would yield a Guidelines
sentencing range of 4-10 months.

      C.   Other Factors to Consider in
           Imposing Sentence.

As noted above, the Booker decision had a drastic
impact on federal sentencing because it eliminated the
mandatory nature of the sentencing guidelines and restored

Hon. Colleen McMahon
September 9, 2008
Page 13

discretion in the imposition of a sentence to the judiciary.

Prior to the Booker decision, downward departures from the applicable sentencing guidelines based upon family circumstances were available only where such circumstances were extraordinary. See e.g. United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991); United States v. Johnson, 964 F.2d 124, 128-29 (2d Cir. 1992). Similarly, downward departures for a defendant's acceptance of responsibility were available only where extraordinary. See United States v. Mickens, 926 F.2d 1323, 1332-1333 (2d Cir. 1991), cert. denied, 502 U.S. 1060, 112 S. Ct. 940 (1992).

Moreover, courts were then permitted to downwardly depart from the sentencing guidelines when there were present "a number of factors that, when considered individually, would not permit a downward departure" but only when considered in combination were sufficiently extraordinary that they removed a case from the "heartland" of cases covered by the guidelines. United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996); see also, United States v. Caruso, 814 F. Supp. 382, 384 (S.D.N.Y. 1993) ("although the defendant's age, military service, medical problems, good employment record, and likely future compliance with the law might not individually justify departure, the totality of these circumstances represent ground for downward departure").

As noted above, after the Booker decision, downward adjustments or variances may be awarded even where such adjustments or departures might have been previously precluded by the guidelines. See e.g., Kimbrough v. United States, __ U.S. __, 128 S. Ct. 558 (2007) (permitting sentencing deviation from guidelines based upon a sentencing disparity between crack cocaine guidelines and guidelines for cocaine in powder form). It is respectfully submitted further that after Booker, supra, in determining what sentence to impose pursuant to 18 U.S.C. § 3553(a), the Court need not follow the guidelines requirement that mitigating circumstances be extraordinary before a downward adjustment is warranted. See United States v. Gall, supra, ___U.S.___, 128 S. Ct. at 595 (rejecting rule that requires

Hon. Colleen McMahon
September 9, 2008
Page 14


"extraordinary circumstances" to justify a non-guidelines
sentence).

Travis became involved in the criminal activity
in this case in 2006, at the age of 22.  Prior to his
involvement in this case, and against all odds, he obtained
a full high school education and he attended college for
two semesters.  It was his dream and desire to pursue a
career in forensic sciences, a desire he developed while
working as a Mortuary Technician at Harlem Hospital.
Stupidly, Travis made some critical errors in judgment that
have resulted in felony convictions that will likely derail
any hope he had in pursuing a career in forensic pathology.

Travis currently lives with and assists his
elderly grandmother.  He stayed in New York and did not
move to Pennsylvania with his mother in order to assist his
grandmother while she was recovering from cancer.  He
involved himself in the conspiracy in this case, in part,
to assist his family financially.  Travis now realizes that
his priorities were misplaced and that involving himself in
the instant conspiracy did not help his grandmother or
anyone else. ███████████████████████████████████ He is desperate to put this
chapter of his life behind him and to continue to help his
grandmother and the rest of his family in a law-abiding
manner.

As outlined above, after his arrest in Ulster
County, Travis realized the traumatic effect that his
involvement in the case has had on his life and on the
lives of his family members and he decided to take steps to
make amends for his misconduct and to ensure that he never
gets involved in any criminal activity ever again.  He
fully accepted responsibility for his conduct and, once
released from the Ulster County Jail, he has not involved
himself in any further criminal conduct.  It is also

Hon. Colleen McMahon
September 9, 2008
Page 15

It should be clear that Travis has fully accepted
responsibility for his conduct.  He realizes that his poor
judgment and his dreadful choices led him to commit the
instant offense.  As noted by his mother and grandmother,
Travis is a good boy who was never involved with drugs or
drinking and who made errors in judgment out of a misguided
desire to help his family member.  See Letters of Ruth and
Renee Sharp, annexed hereto as Exhibit E.

After his release from Ulster County, and once
back in New York City, Travis went back to work as a paid
volunteer in Harlem Hospital and would have even gone back
to school if he had the funds to do so, and if he had not
been arrested in connection with this case.  Unfortunately,
his family's financial situation, the fact that his
grandmother was ill and that his father was incarcerated
precluded Travis from returning to school.  He would still
like to go back to school, but is currently focused on
getting a job that will allow him to meet his restitution
obligation as soon as possible.

It is respectfully submitted that considering
Travis's efforts at rehabilitation, family circumstances,
his genuine remorse, his acceptance of responsibility, his
personal history and the nature and circumstances on the
offense, a sentence of imprisonment is not necessary to:

    1.    reflect the seriousness of the
        offense;

    2.    promote respect for the law;

    3.    provide just punishment for the
        offense;

    4.    afford adequate deterrence to
        criminal conduct;

    5.    protect the public from further
        crimes of the defendant;  and

    6.    provide the defendant with needed
        educational or vocational
        training . . . correctional

Hon. Colleen McMahon
September 9, 2008
Page 16

     treatment in the most effective
     manner.

<u>See</u> 18 U.S.C. § 3553(a).

   Rather, a sentence of time served, with a
two to three month period of home confinement, would
more than adequately meet all of the goals listed
above and outlined in 18 U.S.C. § 3553(a).  In that



, and
in light of the fact

   In sum, the circumstances of the offense,
Travis's efforts at rehabilitation, his family
circumstances and his genuine remorse, and his acceptance
of responsibility, warrant the imposition of a non-jail
time sentence that will allow Travis to continue to work to
help support his family; explore the possibility of
returning to school; and make a meaningful effort towards
his restitution obligation.  With respect to restitution,
it is respectfully requested that any garnishment of
Travis's salary or payments towards restitution not exceed
10% of his income, so that he will be able to continue to
help his family.  With respect to the imposition of a fine,
it is respectfully suggested that under the circumstances
of this case, a fine is not necessary and that the
imposition of a fine will have a negative impact on
Travis's ability to make restitution payments.

Hon. Colleen McMahon
September 9, 2008
Page 17


CONCLUSION

In light of all the above, it is respectfully requested that Your Honor temper justice with mercy and impose a non-jail sentence in connection with this case.

It is respectfully suggested further that a sentence involving a period of incarceration would be greater than necessary to meet the sentencing objectives outlined in 18 U.S.C. § 3553(a) as set forth above.


Respectfully submitted,

Joseph A. Grob

Cc:  AUSA Jenna Dabbs
     (Via Hand Delivery)

EXHIBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 29, 2007

**BY FACSIMILE**

Joseph A. Grob, Esq.
Goldberg, Rimberg & Friedlander, PLLC
115 Broadway, 3d Floor
New York, New York 10006
Fax: (866) 651-3196

    Re: <u>United States v. Esmond Elcock, et al.</u>
      S1 07 Cr. 582 (CM)

Dear Mr. Grob:

    Pursuant to the suggestion of the court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), this letter sets forth the present position of the United States Attorney's Office for the Southern District of New York (the "Office") regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to this case. The Guidelines provisions in effect as of November 1, 2006, apply in this case. This analysis is set forth for informational purposes only, and forms no part of any plea agreement between the Office and Travis Smalls (the "defendant").

    The Indictment charges the defendant in one count. Count One charges the defendant with conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349. Count One carries a maximum sentence of 30 years' imprisonment; a maximum fine of $1,000,000; a maximum term of five years' supervised release; and a mandatory $100 special assessment.

    The Government presently believes that the Guidelines apply to the crime charged in the Indictment as follows:

Joseph A. Grob, Esq.
October 29, 2007
Page 2 of 3

**A.    Offense Level**

1.    U.S.S.G. §§ 2X1.1 and 2B1.1 apply to the Indictment.  Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

2.    Pursuant to U.S.S.G. §§ 2X1.1 and 2B1.1(b)(1)(C), there is a 4-level increase because the loss exceeded $10,000.

3.    Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a).

In accordance with the above, the applicable Guidelines offense level for Count One is 9.

**B.    Criminal History Category**

Based upon the information now available to this Office, the defendant has two criminal history points, calculated as follows:

1.    The defendant was convicted, on or about June 14, 2007, in New York Supreme Court, New York County, of criminal possession of a loaded firearm in the third degree, a Class D felony, in violation of New York Penal Law Section 265.02(4).  The defendant has not yet been sentenced in connection with this conviction.  Pursuant to U.S.S.G. § 4A1.1(c), the sentence imposed will result in at least one criminal history point.

2.    The defendant was convicted, on or about July 26, 2007, in Ulster County Court, of petit larceny, a Class A misdemeanor, in violation of New York Penal Law Section 155.25.  This conviction resulted in a sentence of three years' probation.  Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point.

Accordingly, the defendant is in Criminal History Category II.[1]

---

[1]    At the time of sentencing, the defendant's Criminal History Category may be higher based on the sentence he receives for committing the offense described in paragraph 1.

Joseph A. Grob, Esq.
October 29, 2007
Page 3 of 3

### C.     Sentencing Range

Based upon the calculations set forth above, the defendant's Sentencing Guidelines range on Count One is 6-12 months' imprisonment (Zone B).

In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines offense level 9, the applicable Guidelines fine range is $1,000 to $10,000.

The foregoing Guidelines calculation is based on facts and information presently known to the Office. Nothing in this letter limits the right of this Office to change its position at any time as to the appropriate Guidelines calculation in this case, and to present to the sentencing Judge or the United States Probation Office, either orally or in writing, any and all facts and arguments relevant to sentencing or to the defendant's criminal history category, that are available to the Office at the time of sentencing. Nor does anything in this letter limit the right of this Office to take a position on any departure that may be suggested by the sentencing Judge, the United States Probation Office, or the defendant.

Further, this letter does not and cannot bind either the Court or the United States Probation Office, either as to questions of fact or as to determinations of the correct Guidelines to apply in this case. Instead, the sentence to be imposed upon the defendant is determined solely by the sentencing Judge. This Office cannot and does not make any promise or representation as to what sentence the defendant will receive.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

By:     *Jenna M. Dabbs*
Jenna M. Dabbs
Assistant United States Attorney
(212) 637-2212

EXHIBIT B



49 THOMAS STREET, NEW YORK, N.Y. 10013 TEL: (212) 732-5000 FAX: (212) 964-0591    www.legal-aid.org

*Peter v. Z. Cobb*
*President*

*Steven Banks*
*Attorney-in-Chief*

*Seymour W. James Jr.*
*Attorney-in-Charge*
*Criminal Defense Division*

*New York County*
*Irwin Shaw*
*Attorney-in-Charge*

August 14, 2008

Honorable Colleen McMahon
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl St., Room 640
New York, NY 10007

   Re: <u>United States v. Travis Smalls</u>
     Indictment 07 Cr. 582 (CM)

Dear Judge McMahon:

   I write this letter on behalf of Travis Smalls in the above-referenced matter.

   I am currently on a Leave of Absence from the Legal Aid Society, but represented Mr. Smalls in his pending New York State matter prior to taking sabbatical. This representation lasted over two years. In that time, I had the privilege of getting to know Mr. Smalls and becoming acquainted with his family.

   As stated above, Mr. Smalls has a criminal matter pending in Supreme Court, New York County. That matter originated in 2006 and involved the possession of a weapon that Mr. Smalls purchased in order to protect himself after suffering a gunshot wound. Mr. Smalls was released on his own recognizance at his first appearance in the matter. He very quickly realized that he made a serious mistake in purchasing that weapon and fully accepted responsibility for his misconduct when he pleaded guilty in front of Judge Charles Solomon in 2007. Judge Solomon also recognized that Mr. Smalls had made an immature mistake, but was a young man with promise, and gave him an opportunity to avoid jail time.

   Since 2006 and throughout the pendency of his case, Mr. Smalls has been making regular court appearances and has been compliant with all court conditions including a court imposed curfew. The court, the New York County District Attorney's Office, and my office have monitored his conduct. Mr. Smalls proved to be cooperative and responsive, meeting with me in my office when necessary and assisting me in the preparation and resolution of his case. He has demonstrated these same qualities to the court and has appeared in court each time required to do so punctually and respectfully.

Mr. Smalls is a bright, responsible young man. In the last two years, I have watched as he has made tremendous progress in his efforts to rehabilitate himself and I believe he will continue to do so in the future. Mr. Smalls has also taken on the responsibility of helping his family, as confirmed by his mother, Renee Sharp, and his grandmother, Ruth Sharp.

Because the conduct in his federal case preceded the arrest in State Court, and because Travis has been making significant progress in his efforts at rehabilitation, Justice Solomon has agreed to monitor Mr. Smalls and to impose a non-jail sentence, assuming that Mr. Smalls continues to comply with the terms of his plea agreement.

I understand the Court is to determine what sentence to impose in this matter and that some form of probation or house arrest might be possible. I realize that Mr. Smalls should be punished for his misconduct, but I truly believe that a jail sentence will derail all the progress that he has made to date.

If you should have any questions, please do not hesitate to contact me at (917)612-7931.

Sincerely,

Kate Mogulescu
Staff Attorney

EXHIBIT C

August 8, 2008

To Whom It May Concern:

This letter will confirm that from July 2007 until July 25, 2008, Travis Smalls worked
with me as a paid volunteer/mortuary technician at Harlem Hospital.  Prior to July 2007,
Travis served as paid employee in the Mortuary Department of the Hospital.
Unfortunately, on July 25, 2008, Travis's volunteer position was filled by a former
employee and we can no longer utilize Travis's services.

I highly recommend Travis for any other job as a Mortuary Technician.  He is a bright
young man who works very hard and he is also a good friend.  If I can be of any further
assistance, please feel free to call me at 212-939-4200.

Sincerely,

Norris Cook

Norris Cook

EXHIBIT D

June 3, 2008

To whom it may concern:

I am a firm believer of everything happens for a reason. There was a reason as to why Travis and I lived in the same building, on the same floor, for about 2 years, and never crossed paths. There was a reason as to why we didn't meet until this year. We actually happened to meet by chance. We both walked inside the elevator of our building, he helped carry my son's stroller all the way outside once we got off the elevator, and he couldn't stop staring at me. He didn't speak to me, but told my brother, who was his basketball teammate, that he thought I was beautiful. My brother immediately told me what Travis had said and also included that I should give him a chance because out of all the guys I have dated in the past, he was the better man for me. Boy was my brother right! We went out on our first date and the rest is really history. I fell in love instantly.

Its one thing for me to love and respect this man, but it's another to have my family come to love him and respect him just as much as I have. My son's face lights up every time he sees Travis. Travis picks me up from work every single day. He has never missed a day, it doesn't matter if we had the worst argument in the world; he makes sure he is at my office or the train station waiting for me. We go straight to my son's babysitters and the first thing my son says is, "Travis! Hi Travis!" And he'll run down the stairs, straight into his arms. He can't stop giggling and for a moment it's like only they two exist while they embrace each other and act like they haven't seen each other in years. Meanwhile, I'm stuck carrying his backpack because mommy doesn't exist when Travis is around. This happens every single day we go to pick him up. It's the greatest feeling in the world knowing that my son is safe arms. My son's father has never met him since I told him I was pregnant, he just left me to find my own way of living. Not once has he ever called asking for his son, not once has he visited him, and not once has he ever been there for my son. So to have someone like Travis to be a fatherly figure for the most precious thing in my life is the biggest blessing ever.

He's filled that void that my son and I both have been missing. When Travis told me he was going to the best brother to my brother, the best father to my son, and the best man to me, I couldn't believe it. But here we are, 4 months later, already thinking of our future together. We spend every second possible together. We're texting each other throughout most of the morning that were both at work. He comes straight to pick me up, from there we go pick up our son, and then we go home. Sometimes we stay over sleeping in his house or sometimes we go home at like 10pm. Where as soon as I get home, we're texting each other until I fall asleep. We're so sure of each others love for each other that we have our names tattooed on our bodies. I have his name on my ankle and he has my name on his wrist. I know Travis has done a lot of stupid things in his past, but now that we are together, he has changed his ways around. We spend every second possible together, being a family. He's a father now. So he thinks of what consequences his actions will have not only on him, but on us, his family.

Travis and our son is all I have in this world. Taking him away is like taking the only good thing that has happened in my life. Not just my life, but our son's life. Our son has finally met his father, a real man that is willing to care for him and give him a better life. I just pray for everything to get over with and done so Travis, our son, and myself

can just move forward with our plans and our lives. I love Travis with all my heart and our son loves him just as much as I do. Taking Travis away from a happy home, where we need him like we need food and shelter is just cruelty to the both of us. Hopefully in reading this letter, some light has been shed on the new man that Travis has become.

Sincerely,

Gaby Navarrete
The future Mrs. Gaby Smalls

EXHIBIT E

To Whom This May Concern

My name is Ms Ruth V Shaye I am the grandmother of Travis H Smalls. To me Travis is a loving person, he try to help others in a good way. He never taking a drink or take any drugs he did not like any of that. I feel with in my heart what ever Travis did he did not mean too mean to git in to troubles like this, because he is not one to be lead into any wrong doing he is not a follower, If any thing he would be a leader for the good. I fell that what ever he did was not some thing he would have got into if he was not so hurt being behind the losing of his cousin and his home and my getting sick and our home being takeng away from us. All this took a hole on him. For he looked up to his cousin and he was taking away from him by so people he call a friend, than my

my taking sick with cancer
not knowing what was going
to happen with me, but
I thank God I came though
alright, then the losing of
hour home, that took a hole
on him. To say all this Travis
has gone thought alot, I know
you might say all that has
nothing to do with what
Travis got into, But my beleive
with in my heart he would
not have gotten into any of this
trouble he is in did have a
lot to do with it, To me
it cout him with his gaurd
down and got talk into all
this trouble. I am writing
you letter to pleas fine
lit in your heart to pleas
fine in your heart to
punishment for him is not
by putting him in jail. Please
I am asking you to pleas
fine justice in your heart
that can fine some other
way you can give this
young man a punishment
beside putting him behind

bars. Please have the faith
that I have and many other
have in him If you can just
talk to ask him if he
was given a chance to
do the right think with
out going to jail what would
it be, Please Please
have faith in as I do.
This letter I am writing
with my sincere heart
and faith and hope you
well have faith in him
Travis A. Smalls.

Sincerly Your
The Grandmother
of
Travis Smalls

To When It may concere,
I am Renie Sharp
writing this letter on behalf of
my son Travis. Smalls. Travis
was never in any trouble until,
our family was pulled apart.
He use to live with me + his
grandmother, aunt + Cousin. When
we were forced to move and everyone
was split up, I went into a womans
shelter, my sister + niece went to a
family shelter. My mother stayed
with friends. Travis went to stay
with his godmother. that is when
he felt abandoned. He had just
graduated and he felt he had to support
hiself and help all of us. Not being
with his family really hurt Travis
Now he stays with his aunt + cousins
and grandmother. I live in a SRO
that is why he doesn't stay with
me. He is working part time at
Harlem Hospital and he is more
stable now and need at home
Travis feels loved and want to
work and help his grandmother.
I hope that you will let him
stay home.
                    Thank you Renie Sharp